# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| LOUIS REYNA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 08-00369-CV-W-DGK |
| v. | ) |
| | ) |
| BARNES & NOBLE BOOKSELLERS, | ) |
| | ) |
| Defendant. | ) |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Pending before the Court is Defendant Barnes & Noble Booksellers, Inc.'s ("Barnes & Noble") Motion for Summary Judgment (Doc. #42). Plaintiff responded in opposition (Doc. #43), Defendant replied (Doc. #47) and the motion is now ripe for ruling. For the following reasons, the Motion for Summary Judgment (Doc. #42) is GRANTED.

### Procedural and Factual Background

Plaintiff, acting pro se, brought this employment discrimination suit against his former employer, Barnes & Noble alleging three claims under the Missouri Human Rights Act: (1) race discrimination, (2) retaliation, and (3) hostile work environment. Plaintiff, a Hispanic male, was employed by Barnes & Noble from May 20, 2002 through December 16, 2006, when he was terminated.

Plaintiff has failed to respond to Defendant's statement of facts in support of the motion for summary judgment. In his two-page response to the Motion, Reyna simply states that a jury will conclude that he was harassed and points to several incidents, attaching supporting documents. Defendants request that the Court deem its statement of facts admitted pursuant to Local Rule 56.1. "Even pro se litigants must comply with court rules and

directives." *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005) (citing *Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983) (*per curiam*) for the proposition that "pro se parties are not excused from complying with procedural and substantive law"); *Bennett v. Dr Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) (noting that a plaintiff's pro se status does not entitle him to disregard the Federal Rules of Civil Procedure) (quoting *Carman v. Treat*, 7 F.3d 1379, 1381 (8th Cir. 1993)). Because Plaintiff did make an attempt to respond to Defendant's Motion, the Court reviewed the facts and the evidence submitted by Plaintiff. *Tipler v. Moore*, No. 07-4014-CV-C-NKL, 2008 WL 1990799, at *1 (W.D. Mo. May 2, 2008) (Laughrey, J.) ("[B]ecause Tipler is proceeding pro se, the Court will attempt to construe-where appropriate-his response as properly responding to Defendants' factual statement."). The Court finds the following facts undisputed.

Plaintiff initially complained to Barnes & Noble District Manager Gary Simonson about discrimination in July 2005. Reyna had been promoted from Music Seller to Head Cashier, and was complaining that he should have received a rating of Exceeds Standards in his Fall 2004 review, instead of the Meets Standards that he received. Reyna complained that the Store Manager, Angelo Cusomano, was not considering him for promotions (including Department Manager and Assistant Store Manager) because Cusomano was discriminating against him. Simonson said that he would investigate Reyna's complaint. On July 18, 2005, Reyna called Regional Director Karen Garvey and made the same allegations, adding that he was dissatisfied with Simonson's response. Reyna also added that he wanted Cusomano to be terminated. Simonson and Garvey met with Reyna and agreed that Simonson would investigate the complaint, that Reyna would be re-reviewed, and that Cusomano would meet with Reyna about the Department Manager position that was available. Cusomano re-

reviewed Reyna and changed his rating to Exceeds Standards. Reyna then requested to be re-interviewed for the Department Manager position, and was promoted over a white female employee who had been with Barnes & Noble since 1994. In September 2005, Cusomano resigned from Barnes & Noble, and Kelly Long became the new Store Manager.

Department Managers have no direct reports, but have oversight of particular areas within the Barnes & Noble store. Once he became a Department Manager in September 2005, Reyna began supervising other employees' performance, despite the fact that no employees were under his direct supervision. In November 2005, Reyna wrote a letter to Long complaining about Erin Bush (the Head Cashier) and Debra Hussey (the Community Relations Manager) and describing them as insubordinate and hostile. In December 2005, Reyna sent Barnes & Noble a letter about his first 90 days as a Department Manager, again complaining about Erin and voicing his dissatisfaction with Barnes & Noble's decision not to promote him to the Assistant Store Manager position, while Bev Sidener, the Café Manager, was promoted to an Assistant Store Manager position. Barnes & Noble points out that the Café Manager to Assistant Store Manager promotion path is a common one inside the store. During a managers meeting in December 2005, Reyna complained about Sidener and her promotion, and also raised his issues with Bush. Long met with Reyna privately after the meeting to attempt to address (again) his concerns. Long also addressed Reyna's assistance to another cashier in writing a letter of complaint about Bush, and told Reyna that he should have resolved her concerns.

On December 21, 2005, Reyna again complained to Simonson and Garvey, stating that he felt he was being subjected to a hostile work environment as a result of his attempts to hold Bush accountable for her job duties. On December 23, Bush notified Simonson that Reyna

was harassing and provoking her, and that his conduct was exacerbating her disclosed heart condition, to which all the other managers were sensitive. On December 27, Hussey notified Simonson about her concerns about Reyna's unprofessional behavior. On December 28, another Department Manager, Kris Martin, complained to Simonson about Reyna's antagonistic and aggressive behavior. On December 28, Simonson met with Reyna and Long in an attempt to address his concerns and manage his problematic behavior, telling him specifically that several booksellers have complained about his management style. Simonson also told Reyna that Bush had a heart condition that Reyna needed to be aware of this while dealing with her. Simonson told Reyna that he wanted him to succeed, but that he would need to follow his managers' direction to do so. On December 29, Martin reported that Reyna refused to discuss work-related matters with her, stating that he could not have a conversation with her because he had been instructed not to do so.

At the end of the December 28 meeting, Reyna informed Simonson and Long that he was going to be contacting Garvey and Mark Bottini, the Vice President of Store Operations that he was being subjected to a hostile work environment and was being retaliated against. Reyna contacted Barnes & Noble's We Listen hotline on December 29 and made his complaint, which Bottini directed Garvey to investigate. In a December 30 letter to Garvey and Bottini, Reyna requested a salary adjustment and bonus as a result of the discrimination and hostile work environment that had started under Cusomano and continued under Long. In that letter, Reyna stated that Bush's alleged insubordination resulted in a hostile work environment, and that Long discriminated against him by allowing Bush (instead of Reyna) to interview potential seasonal employees. Also on December 30, Simonson met with Reyna to discuss the complaints (mainly by Bush and Hussey) about Reyna's management style.

Garvey met with Reyna on January 3, 2006 and discussed his concerns and allegations of discrimination. She also told him that they were not going to adjust his salary or give him a bonus as the result of any alleged discrimination. On January 6, Simonson met with Reyna and Long and asked Long to set up training with Reyna and the other Department Managers in an effort to better integrate Reyna into the store. On January 10, Reyna sent another letter to Bottini complaining about the ethics of Simonson and Long, and reiterating the events of the previous month. Simonson called Reyna on January 21 to discuss the January 10 letter. Simonson and Long met with Reyna again on January 24 to follow up with him on his performance issues and the problems his management style was creating with the other store employees. This pattern of complaints and meetings continued throughout January and February.

On February 3, 2006, Reyna violated company policy by leaving the store unattended. Reyna called Long at home to ask if he was going to be fired for this violation, and Long told him that he would need to talk to Simonson, but most likely Reyna would be counseled in writing. Reyna also called Garvey on February 9, offering several excuses for leaving the store, as well as reiterating his position that he had not done anything wrong, and insisting that Garvey conduct a full investigation. On February 10, Reyna received a Personal Development Plan ("PDP") based on his leaving the store to run a personal errand on February 3.

On March 21, Simonson inspected the store, and discussed with Reyna his role and responsibilities as Department Manager. Simonson noted that Reyna was unfamiliar with several of his areas of responsibility. On March 27, Sidener wrote Simonson a letter complaining about Reyna's lack of teamwork and initiative in his Department Manager role.

Reyna received his annual Performance Review on April 4, 2006, which gave him an overall rating of Needs Improvement ("NI"). The comments focused on Reyna's failure to acknowledge that the goals of his manager position were different that his previous position, and his lack of initiative in learning his new role, his failure to model a positive work environment, and failure to work to implement changes. Each of these criticisms were supported by specific examples of behavior that the company wanted to see improved.

In April 2006, Reyna sent a number of letters to Garvey complaining about various employees. In his own words, Reyna decided he was going to "exercise my right as an employee and if people were making complaints about me . . . then I'm going to start airing my complaints about what I see is wrong with the store." Reyna Depo. at 237:20-238:5. Reyna complained about the scheduling over Easter weekend, about Sidener not being responsive to store pages, and that Sidener was committing fraud by favoring Hussey (with whom she was friendly outside of work) in scheduling shifts. Reyna testified that these were complaints not about discrimination but about the store practice, which added to "their hostility toward me and their motivation to retaliate." 233:20-234:3.

Simonson again met with Reyna in early May 2006, which confirmed his conclusion that Reyna was not taking responsibility for the challenges in his working relationships and that Reyna's complaints were unfounded. During this conversation, Reyna said that he did not care what his co-workers thoughts of him, and explained that he had refused to help one of the other managers because it was not his job. On May 8, 2006, Reyna wrote a letter to the EEOC alleging that he had been subjected to discrimination and a hostile work environment.

On May 25, Reyna called Garvey to complain that Sidener had left a cigar stub in an envelope in his box, along with a note not to use the third floor area by the dumpster for

6

smoke breaks. Reyna asked Long if he knew about Sidener's note and Long said yes. Reyna asserted to Garvey that he had never been told before that he could not use the third floor area as a smoke break area or that he could not take smoke breaks while he was the only manager in the store. During his conversation with Garvey, Reyna wanted permission not to speak to Long, Sidener, or Simonson, but refused Garvey's offer to transfer him to another store. Reyna also demanded that Long and Sidener be terminated. Garvey immediately called Human Resources and initiated an investigation into Reyna's allegations.[1] She also told Reyna to call Human Resources and gave him a number and a contact person. Reyna also told incorrectly Long that Garvey had excused him for the remainder of the afternoon. Reyna spoke with Brigid Barkley on May 30 about his complaints of discrimination and hostile work environment, who told him that Regional HR Director Kay Prendergast would be investigating his complaints. Garvey called Reyna on June 19 and told him that Barnes & Noble did not consider the cigar incident to be evidence of discrimination or a hostile work environment, but that appropriate corrective action has been taken.

In June, Reyna and Bush had further conflicts, and Bush reported that Reyna had told her that he had complained about the management team to HR, the EEOC, and Corporate representatives. Reyna said that he was planning to get them all fired and that he would "pull the discrimination card to win."

On June 14, 2006, Prendergast met with Reyna for three hours. Reyna testified that he was able to fully explain his concerns and that he gave her copies of all the letters he had written.

_____

[1] Ultimately, both Long and Sidener received a PDP as a result of Sidener's placing the note and the envelope in Reyna's box and Long's knowing about it, based on inappropriate communication resulting in strained working relationships.

7

Throughout 2006, Reyna continued to have issues at work. Simonson and Long met with him on June 26 to address his participation in manager meetings, his interactions with Bush, some customer service complaints about him, and his 90-day Performance Re-review. The meeting started with Reyna asking Simonson whether he had to option of talking to him, and Simonson telling him that it was a required meeting. Reyna continued to deny that his behavior was problematic. Long met with Reyna again September 10 to discuss Reyna's performance.

On August 8, Prendergast informed Reyna that she had completed her investigation and found no evidence of discrimination. Reyna wanted another meeting with Prendergast, which she scheduled, but he cancelled.

On November 8, 2006, Reyna wrote a letter to Barnes & Noble CEO Steve Riggio raising the same complaints raised in his previous correspondence. Reyna gave Sidener a copy of this letter.

November 24 Reyna received his six-month Re-Review, and rating of Not at Standards ("NS"). The review indicated that he was continuing to struggle in several areas, including contributing to a negative work environment. Reyna refused to sign the Re-Review. The Company placed Reyna on a final PDP, which listed specific actions that Reyna would need to take to continue his employment with Barnes & Noble, including refraining from engaging in conversation with the staff that is detrimental to the overall operations of the store, including non-supportive comments toward the management team. Reyna was specifically warned that failure to improve would result in his termination. On November 27, another employee, Kendall Seal, complained that Reyna cornered him and asked him whether he had spoken with Simonson or Long because Reyna's recent conversation with them

8

(Simonson and Long) could be traced back to Reyna's previous conversation with Seal. Based on Seal's complaint, on December 16 Simonson met with Reyna, who admitted to having a discussion with Seal. During this conversation, Reyna was aggressive and insubordinate. Simonson terminated Reyna's employment on December 16, 2006.

## Standard of Review

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party, and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

**Analysis**

Barnes & Noble contends that it is entitled to summary judgment for three reasons: (1) Plaintiff cannot establish a prima facie case of race discrimination nor can he establish that race was a contributing factor in his termination, (2) Plaintiff cannot establish pretext as to his retaliation claim, and (3) Plaintiff cannot show either that his working environment was severe or pervasive and he cannot establish a nexus between his race and the alleged hostile environment. Plaintiff does not respond with any level of particularity to these arguments, but simply contends that he is confident that a jury will side with him.

### A. Race Discrimination

Because Plaintiff asserts a claim under only the MHRA, and not Title VII, the Court looks exclusively to Missouri law in resolving Defendant's Motion. Under the MHRA, an employer is prohibited from discharging or otherwise discriminating against an individual based on, among other things, race. Mo. Rev. Stat. § 213.055. The MHRA defines "discrimination" as "any unfair treatment based on race . . . as it relates to employment" Mo. Rev. Stat. § 213.010(5). In *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820-21 (Mo. 2007) (*en banc*), the Missouri Supreme Court held that a discrimination claim survives summary judgment "if there is a genuine issue of material fact as to whether [race] was a 'contributing factor' in [defendant's] termination decision." *Id.* at 820; *accord Baker v. Silver Oak Senior Living Mgmt. Co.*, No. 06-5068-CV-SW-JCE, 2007 WL 2994318, at *7 (W.D. Mo. Oct. 11, 2007) (England, M.J.) (analyzing age discrimination claim brought under MHRA using contributory factor test). Despite the adoption of the contributing factor test, state courts "deciding a case under the MHRA . . . are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Daugherty*,

231 S.W.3d at 818 (citing *Midstate Oil Co., Inc. v. Mo. Comm'n on Human Rights*, 679 S.W.2d 842, 845-46 (Mo. 1984) (*en banc*)).

Although Reyna found much to complain about at Barnes & Noble, none of it can be tied to race discrimination. None of his myriad complaints have any relationship to the perceived discrimination. Moreover, the only evidence to which Reyna points in asserting that he was discrimination against are his own self serving allegations and speculations, which are wholly insufficient to create an issue of fact. *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (affirming summary judgment on race discrimination claim where "plaintiff presented no such evidence other than his own unsubstantiated allegations in deposition"); *accord Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008) (holding, in discrimination case, that "'[a] plaintiff may not merely point to unsupported self-serving allegations'" to defeat summary judgment) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 917 (8th Cir. 2006) (affirming summary judgment where plaintiff's evidence of pretext was "entirely speculative"). The incidents that Reyna points to demonstrate personality conflicts, but not discrimination. *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) ("Title VII prohibits intentional discrimination based on certain, discreet classifications; it does not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices.") (citing *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997)). Plaintiff simply cannot point to any evidence that indicates that race was a contributing factor to his termination.[2]

---

[2] For this same reason, Plaintiff would not be able to establish a prima facie case of race discrimination under a *McDonnell Douglas* analysis.

**B.      Retaliation**

On February 24, 2009, the Missouri Supreme Court issued an opinion applying the contributing factor test discussed above to retaliation claims under the MHRA.  *Hill v. Ford Motor Co.*, -- S.W.3d --, 2009 WL 454281, at *7 (Mo. 2009) (*en banc*).  Although the *Hill* opinion is not yet final, it seems to be a clear indication that the Missouri Supreme Court intends to apply the contributing factor test to all employment discrimination claims brought under the MHRA.  Thus, this Court will apply the contributing factor test.

Again, Reyna simply cannot establish that retaliation was a contributing factor in his termination.  Reyna first complained internally about discrimination in November 2005, and complained to the EEOC in May 2006.  He was not terminated until December 2006.  Thus, there is no temporal connection that supports his retaliation claim.  *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (holding that six month lapse was insufficient to show causation); *Lewis v. Saint Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, and that a two-week interval was 'sufficient, but barely so.'") (internal citations omitted).

Reyna also asserts that he can show retaliation because his twenty letters complaining about others' actions did not result in anyone being terminated, but one letter from a white employee complaining about his actions resulted in his termination.  This argument misconstrues the facts: there were numerous complaints about Reyna's conduct throughout 2006 by a number of employees.  Barnes & Noble continued to try to work with Reyna despite numerous complaints, and did not terminate him until there was a complaint about the exact behavior that he had been placed on a final PDP for and about which he had been

warned could result in his termination. *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005) (holding that filing an EEOC complaint does "not insulate an employee from discipline for disrupting the workplace'" or violating the employer's rules) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)); *accord Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) ("An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action.") (citation omitted). The undisputed evidence shows that Reyna continually failed to follow the instructions he received about managing employees and disrupting the workplace. Reyna cannot show that retaliation was a contributing factor to his termination.[3]

### 3.     Hostile Work Environment

Plaintiff's claim for hostile work environment under the MHRA is subject to the same analysis as a hostile work environment under Title VII. *Weger v. City of Ladue*, 500 F.3d 710, 717 n.4 (8th Cir. 2007) (citing *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005)). Reyna must show (1) he is a member of a protected group, (2) he was subjected to unwelcome race-based harassment, (3) the harassment was because of his membership in the protected group, (4) the harassment affected a term, condition, or privilege of his employment, and (5) Barnes & Noble knew or should have known of the harassment and failed to take prompt and effective remedial action. *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008) (citing *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008)). Reyna must also establish that the harassment he suffered was sufficiently severe

---

[3] The Court would reach the same conclusion when examining Reyna's retaliation claim under the traditional burden shifting scheme. *Richey*, 540 F.3d at 784 (explaining that retaliation claims without direct evidence are typically analyzed under the McDonnell Douglas standard). Here, Reyna failed to show either a prima facie case (he cannot establish a causal connection) or pretext (there is simply no evidence giving rise to an inference of retaliation).

or pervasive to alter the conditions of his employment and create an objectively abusive working environment. *O'Brien v. Dep't of Agriculture*, 532 F.3d 805, 809 (8th Cir. 2008) (quoting *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007)). In making this determination, courts look to the frequency of the conduct, the severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *O'Brien*, 532 F.3d at 809 (*Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006)).

Reyna has simply presented no evidence from which a jury could find that any of the actions that he alleges as hostile were related to his race. *Carpenter*, 481 F.3d at 618 (holding plaintiff must show that he was subjected to unwelcome race-based harassment, and the harassment was because of his membership in the protected group, among other things, to establish hostile work environment claim); *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999) (holding that instances of harassment are relevant only where they "are part of a course of conduct which is tied to evidence of discriminatory animus"). Reyna's unsupported statements that he believes that he was being discriminated against are insufficient in light of the lack of any race-based comments or conduct. *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) ("A plaintiff's subjective belief or speculation that neutral statements are discriminatory does not establish a claim of hostile work environment."); *accord Bailey v. Augustine Med., Inc.*, No. Civ. 01-695 ADMAJB, 2003 WL 288470, at * (D. Minn. Feb. 7, 2003) (rejecting plaintiff's contention that facially neutral statement was evidence of harassment based on the "tone" used and citing *Palesch*).

Even if he could establish a link between the alleged harassment and his race, the events Reyna complains of simply do not rise to the severe and pervasive level of

"discriminatory intimidation, ridicule, and insult" that underlies an actionable claim. *Carpenter*, 481 F.3d at 618; *accord Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892-93 (8th Cir. 2005) (finding workplace where plaintiff had second-hand knowledge that his co-workers and some managers referred to him as a "nigger" and where his vehicle had been vandalized on several occasions not objectively severe and pervasive); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) (finding racial remarks, made directly to plaintiff, once a month for two years by owner and operators, was insufficient to render the workplace objectively hostile). Reyna has not presented evidence from which a reasonable jury could conclude that he was subjected to a hostile work environment.

## Conclusion

Barnes & Noble's Motion for Summary Judgment is GRANTED. Plaintiff failed to present any evidence to support his claims for race discrimination, retaliation, and hostile work environment under the MHRA.

**IT IS SO ORDERED**

Date: __April 3, 2009__                              ___/s/ Greg Kays_____
                                                                       GREG KAYS, JUDGE
                                                                       UNITED STATES DISTRICT COURT